The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons in any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. That saves the United States and this Honorable Court. Thank you. You may be seated. Good morning and welcome to the Fourth Circuit. We have two cases to hear for oral argument today, and the first is Bishop of Charleston v. Adams. Whenever you're ready, Mr. Sir. Good morning, Your Honors, and may it please the Court, Daniel Sir, along with my colleague and friend, Rich Dukes, on behalf of the plaintiff appellants in this case. Your Honors, the district court deserves to be reversed for the very simple reason that there was no evidence properly before it to support summary judgment in favor of the defendants. In this case, there were two expert witnesses. Counsel, shouldn't we probably start with the obvious jurisdictional problem? Fair enough, Your Honor. So a few weeks ago, the state introduced an affidavit from one of the defendants saying that the money is gone, essentially. There were two pots of money in this case. The first was the governor's emergency educational response funds, the so-called GEER funds, and that money has been gone for some time, and we have acknowledged that. And then the second pot of money was this Act 154 money, which was appropriated by the general assembly. You not only acknowledged that. In your brief, you conceded, didn't you, that you cannot apply for or receive any such funds, the GEER funds, right? Yes, the GEER funds are gone, Your Honor. So why doesn't that apply to the 154 funds that are also gone? Well, I think the key difference is the states voluntarily joining this litigation, its intervention, essentially submitting to this court's jurisdiction and waiving its Eleventh Amendment immunity. Well, that may or may not fix a sovereign immunity problem, but it doesn't fix a mootness problem. There's no state voluntarily intervenes, so now we can consider a moot case doctrine, is there? Well, I think it's because there are damages, Your Honor. We asked for damages in our amended complaint. Counsel, but the district court said that you didn't have a damages claim because of sovereign immunity, and I understand that you now disagree, but you didn't appeal that. Well, to be clear, Your Honor, the district court said that as to the governor and the GEER 1 funds. The district court did not address sovereign immunity as to the Act 154 funds. How would the sovereign immunity analysis be different? Either you're immune or you're not. Actually, Your Honor, the court's analysis was specific to the governor. Because of the nature of the discretion, the governor exercised. No, no, that was when the court was talking about why the case, why you didn't have standing. But the sovereign immunity point, I just don't understand. Either the state is immune from a damages award or it's not. Well, so we've asserted that the state is not immune from a nominal damages award. But you didn't appeal. I understand what you're asserting now, but what I'm trying to figure out is once the district court ruled against you on sovereign immunity grounds, why you didn't appeal that. I would say we did not appeal that because it was not relevant at the time because of the Act 154 funds, which we believe were still available. So I would concede that as to the governor, that money is not recoverable. As I recall, the district court's footnote, it said as to all the state defendants. I've got it right here. It's J318 footnote 3. The district court says, quote, to the extent that plaintiffs seek damages, sovereign immunity bars that relief against the official capacity defendants here. That's the footnote. Correct. So the official capacity defendants would be the governor and the other state officials, but not the state as an entity. Well, the Supreme Court has long said that when you sue a state official in your official capacity, that is a suit against the state for 11th Amendment immunity purposes. So if the official capacity defendants are immune, the state is also immune. Well, I would say no, Your Honor, because the state voluntarily chose to join the litigation. And again, I guess I'm just making the point Judge Harris made. You could have appealed that ruling and you did not. Again, I would not say that there was something to appeal because. A dismissal if you're a complaint for damages isn't something you can appeal? I would say that that particular point was not something the district court ruled on. The district court ruled in the footnote you read as to the official capacity defendants. The district court did not rule as to the state. And one of the reasons for that was because the district court believed those funds were still available. And that's why the district court reached the merits in the first place. But if that's true, if that's true, why is the district court's order a final judgment under 1291? Because now what you're telling me is you had a claim for nominal damages against the state, which you claim is different for your claim of nominal damages against the official capacity defendants. And now you're telling me the district court didn't rule on that point. If that's true, there's no 1291 final judgment. Obviously, the judgment in this case was that the summary. I know, but unless the district court resolves all claims against all parties, there is no final judgment under 28 U.S.C. 1291. I would say the district court did resolve all claims. Against all parties. Against all parties. Then that means the district court dismissed your claim for nominal damages against the state. I agree, Your Honor, and I believe it was incorrect in doing so. What we argued in our briefs here is that the Supreme Court's recent decision in the Georgia Gwinnett case allows for nominal damages when there is a constitutional violation and that mootness is not a jurisdictional bar to nominal damages when a constitutional violation has occurred. As Justice Gorsuch, I think, puts it well in his concurrence, where there is a constitutional violation, there is an injury. And so in that case, the Supreme Court allowed nominal damages to go forward against an arm of the state, against Georgia Gwinnett College, which is a public college under the Board of Regents. Of the state of Georgia. It was an official state agency. And we mentioned in our brief a case from the Northern District of Georgia holding that Georgia Gwinnett College is an official state agency. And I would note as well that in their papers, the state defendants are able to point to no holding from this court saying that nominal damages are barred by sovereign immunity and that the one case they do cite is an unpublished decision from the Sixth Circuit. So I think the recent Supreme Court decision should be sufficient for this court to feel comfortable allowing this case to go forward on a nominal damages basis. Can I just clarify to make sure I understand your argument? There is no dispute, right, that your claim for injunctive relief is moot now. Is that right? Yes, I believe that would be right, Your Honor. Obviously, we brought this case initially asking for injunctive relief because the funds were available. We sought a preliminary injunction initially that was denied. And we decided to try to move expeditiously for summary judgment because of the order that we were given. The way that Judge Hendricks denied it kind of indicated she wanted a robust evidential record. We believe that's what we provided. Obviously, we believe the state didn't provide any contrary record and that that should be the reason for this court to reverse that decision. So putting aside the forfeiture issue on damages for a minute, can you help me out with another question I have? So I understand the rule that sovereign immunity can be waived. And I understand that by voluntarily submitting yourself to the jurisdiction of the court, you waive immunity. But then, you know, we also have this provision of the Federal Rules of Civil Procedure that says, you know, if someone is challenging the constitutionality of a state law, that feels like something the state probably has an interest in. And so the state can intervene as a matter of right for the limited purposes of defending the constitutionality of this law. Now, as far as I can tell, at least the Supreme Court and this court have never squarely resolved the possible tension between those two things, which is that we have a rule that's designed to protect states and look out for their interests by saying, if someone's going to argue your law is unconstitutional, you probably have a right to be there, with the principle that normally if you join a lawsuit, you've waived sovereign immunity. I guess the first question is, are you aware of a Supreme Court decision or a decision by this court that sort of wrestles with resolving what seems to be an inherent tension between those two things? I am not, Your Honor. That is a fascinating observation. Honestly, it is not one that occurred to me before. But you're right, it does. It is striking. It just seems weird to say that the reason the state waived their sovereign immunity was because someone was filing a lawsuit saying one of the state's laws was unconstitutional. And the state says, well, we kind of have an interest in our laws not being declared unconstitutional, so we'd like to be heard. And then again, putting aside the forfeiture argument, they're now hit with an argument from your clients that by doing so, they have waived the sovereign immunity that they would otherwise have against a damages action. That seems odd. I don't disagree. It seems odd. Obviously, the argument we made is, I think, a straightforward application of this court's holding in the Stewart case, which is that when the state voluntarily intervenes in litigation, or in that case, I was going to say, wait, no, that's completely different. Stewart is a case where the state defendants who are sued in state court remove a case to federal court. In that case, the state is the one that's choosing to commence litigation in federal court. The state didn't choose to commence litigation in federal court here. Some other people chose to commence litigation. Indeed, my clients. Right. And the state says, well, if you're going to be talking about the constitutionality of our law, we would like an opportunity to participate in the discussion of the constitutionality of our law. That seems quite different from Stewart. In Stewart, the state was saying, we want to be in federal court. Just kidding. Let's not be in federal court. And there's a bit of a bait and switch to what that maneuver is. But this doesn't seem like that. I certainly wouldn't say that the state engaged in a bait and switch here, Your Honor. But I think the important part of Stewart is not the holding. It's the preceding discussion. Right. So in Stewart, there's a paragraph leading up to a decision about removal specifically, where this court addresses various Supreme Court decisions dealing with, for instance, tax litigation. And the bottom line of this court's analysis of those cases is to say that these the common thread across these cases is that when the state voluntarily chooses to submit itself to this jurisdiction of a court, it cannot then turn around and say, oh, we have 11th Amendment immunity. You have no jurisdiction over us. And I think that rule does make sense, right, to the extent that what we're going for is a common sense rule here. So your view is that notwithstanding the special privilege that the Federals of Civil Procedure give to the state, what they really should have done in this case is stay out of it and let other people litigate the constitutionality of their laws because the only alternative to doing that is exposing themselves to damages liability? Well, I think it's where your honor started, which is that when we sued the governor and the other state officials, the state was functionally represented already. The state of South Carolina has chosen a sort of interesting arrangement where the attorney general is not necessarily there to defend state officials. Obviously, in many other states, that's a different arrangement. But the state has made its constitutional choice in how it arranges itself or statutory choice. And so if the attorney general on behalf of the state feels like he needs to come in beyond the official defendants, then he has to live with the consequences of that choice. Okay. Mr. Sir, if we get beyond mootness, I know you wanted to talk about your summary judgment argument at first, and you have about four minutes left in your this part of the argument. Yeah, I appreciate it, Judge Thacker. Do you want to talk about that? I do. So in this case, there were two expert witnesses. They were both provided by the plaintiffs. And they both produced comprehensive reports based on dozens of historical documents and academic articles and journals analyzing those historical documents. That was the record properly before the district court. The state filed a brief with a whole bunch of other historical materials and documents, but no expert witness to properly lay a foundation for those materials. And yet Judge Hendricks chose to grant summary judgment to the state based on the documents that it had provided and the historical story that it told based on those documents. I think that's obviously wrong. The district court should not be able to grant summary judgment against us, in other words, that all inferences should be drawn in our favor as the nonmoving party, that she would grant judgment to the other side when there was no evidence before her to support that. So I certainly agree with you if this was like a Title VII case. But tell me if I'm wrong. But my sense is that when we're doing like Arlington Heights analysis, courts don't really normally treat this as a normal Rule 56 issue. I mean, you see summary judgment granted in cases involving Arlington Heights all the time, don't you? I think that's right, Your Honor. Although one of the keys in this instance is there's a dispute over particularly Dr. Graham's expert witness testimony that the state feels, we would disagree, but the state feels that there is a disconnect between Dr. Graham's report and what he said in his deposition. And so in that instance, that seems especially the sort of thing that should go to a trial, a bench trial. If there's a dispute over expert witnesses' interpretation of historical facts, I think we all agree on the historical facts, right? It's a question of fact. Everybody acknowledges these various things are true. The question is what is the historical meaning interpretation that we should give to these things? So it's at least a mixed question of law and fact. What evidence did you present of disparate impact? So one of the reports that we cited is a report from Congress, a report to Congress rather, in the 1890s, which showed enrollment in the various private schools in South Carolina at the time. So a disparate impact in 1890? A disparate impact in 1890. Did you present evidence of disparate impact this present day? The 1970 version? Yeah. Yes. There was a separate document that looked at the number of schools that were available. Do you have a J.A. site for that? I do not, Your Honor. Okay. Although I think as long as we're talking about disparate impact, if I can anticipate where Your Honor might be leading, I think it's important for this Court to try to figure out how to read Raymond correctly, that there are parts of the NAACP versus Raymond case which suggests that disparate impact is a threshold issue, and then there are other parts of the Raymond case that suggest that disparate impact is one of several factors, but that it is not a threshold or a determinative factor. Obviously, I believe the second reading is right, that even if we failed to show disparate impact to the satisfaction of the District Court, that the other factors more than make up for that, because what the Court directs us to do in Arlington Heights is undertake a holistic analysis of all of the factors, and all of the other evidence I think is overwhelming. And in fact, it's actually a good reason not to make disparate impact. So for instance, one of the issues in this historical circumstance is immigration. So we were talking about immigration to the United States by persons from Catholic countries in Europe, and South Carolina's goal was to exclude immigrants from coming to the state. Well, there wouldn't necessarily be evidence of disparate impact in terms of the number of Catholics in the state, because the whole point was to keep Catholics out of the state in the first place, and so it wouldn't show up in the data. So I think it's actually a good illustration of why disparate impact should not be a determinative factor, but rather one of several factors, because the historical evidence might tell a different story. Unless your time is over. I see that. Unless my colleagues have questions, you do have time in rebuttal. I appreciate it, Judge Thacker. Thank you. Thank you. All right, Mr. Lambert. Judge Thacker, and may it please the Court, I'd like to address the jurisdictional issues, and my friend, Mr. Heydrich, would like to address the merits. My friend on the other side has forthrightly admitted that the appellant's claims are moot as to the GEER funds and as to any injunctive relief on the Act 154 funds. So all that's potentially left are damages claims as to the Act 154 funds. But the appellants face two hurdles they cannot overcome there. One is their own waiver of the issue, and two are their merits arguments. Judge Harris, as your question near the beginning noted, this was an issue they did not pursue and argue below. It is an issue they did not brief here. Under well-established doctrine, the issue is waived. That alone is sufficient to end the matter. But if the Court were to go beyond that and find that the waiver is excusable for some reason, the argument fails on the merits. All that has fundamentally happened here, as with the State, is that it intervened to defend a State constitutional provision from a challenge under federal law. Judge Heitens, as you acknowledged or recognized in your question, it would seem awkward to tell a State your law is being challenged, but you, the State, as an entity, may not intervene unless you are willing to waive sovereign immunity. That puts the State in the precarious position of either defending its law and risking damages or hoping someone else defends the law sufficiently enough and preserving its sovereign immunity. Although, in fairness to them, I'm not sure that's true either because, well, okay. In a federal court of appeals, a State can file an amicus brief as of right, right? You don't need to ask anyone's permission. You can file any amicus brief in any case you want to. Now, as I recall, there is not an amicus brief rule in district court. So I guess what you're saying, the only way the State can participate as of right in the district court is by intervening? I think that's right, Your Honor, and I think the context in which the State's intervention here is particularly important to show that. The original complaint asserted certain claims. The amended complaint asserted broader claims, some of which did not go directly to the governor or his authority under the GEER funds. It was after the amended complaint and after a potential intervener in district court accused the governor of colluding with the plaintiffs that the governor asked the attorney general to intervene on behalf of the State. So the context here in which intervention happened makes it even clearer that this wasn't some attempt to throw sovereign immunity to the wind and jump in, but the State had a particular reason to jump in after proposed interveners, the Orangeburg County School District and the South Carolina chapter of the NAACP, had thought there was collusive litigation. To be sure, all of the parties in this case rejected that, and the district court didn't find it a credible one either, but the allegation was enough to ask the State to intervene to alleviate any potential concerns on that front. So that would take care of the State sovereign immunity waiver. That leaves them with this claim of nominal damages against the official capacity defendants under the Supreme Court's recent decision in the Georgia-Gwinnett case, but it's a curious reading of that case to say the Supreme Court is now holding that nominal damages are sufficient to get over sovereign immunity in a case that never says sovereign immunity. The Supreme Court in the Georgia-Gwinnett case never discussed sovereign immunity. It would seem an incredible reinterpretation of sovereign immunity law to say that official capacity defendants can be sued for nominal damages to get past sovereign immunity and deal with redressability. Fundamentally, Georgia-Gwinnett is a redressability case of outstanding. And you think that the cases in the real world that Gwinnett matters, I mean, imagine I sue some correctional defendants in their personal capacity for injunctive relief. They change what they're doing, so now my request for injunctive relief is moot. Gwinnett allows me to keep my case alive with a claim for not. If I'm suing, like, the head of the State Department of Corrections or something, like, I'm just trying to make sure that you're not making Gwinnett a case that doesn't actually affect any situation in the real world. Maybe that's a better way of putting my question. What category of cases do you think Gwinnett actually saves, then? That's a good question, Judge Heitens. It also, I think, depends on each case what the litigation has been and the positions the official capacity defendants potentially took below. I'm not familiar with the underlying proceedings in Georgia-Gwinnett to know what strategies and positions the State defendants took in that particular case. But what I do know for sure is that sovereign immunity wasn't an issue that was discussed by the Supreme Court there. And it's been bedrock law that official capacity defendants enjoy the same sovereign immunity as the State when they're sued in their official capacity. But not when they're sued in their personal capacity. Correct. So perhaps there's something in a personal capacity case. I think there's also something to nominal damages and redressability in cases involving private litigants, potentially. If the injunctive relief you want is moot but there are nominal damages you can be awarded, you think back to basic trespass law, you can get $1 in nominal damages to vindicate your right. That would say a federal court retains jurisdiction under a standing analysis for Article III purposes. It's not a sovereign immunity case. I think fundamentally all of these cases are different than the cases in which my friend on the other side relies in the suggestion of mootness briefing. For example, the Clark v. Bernard case from the Supreme Court is when the State is actually asserting a claim in a bankruptcy proceeding to have its rights vindicated. The Stewart case, that long discussion was premised on the idea that States can't use procedural gamesmanship to gain tactical litigation advantages. So the State, having waived its sovereign immunity in State court, couldn't remove a case to federal court to try to regain that sovereign immunity. That's why the Stewart case focuses so heavily on the Lapidus case from the Supreme Court in 2001. And this court in a 2013 opinion, I believe, in Sotheby Town of Naxhead, discussed Lapidus in greater detail in the context of Williamsburg County and procedural rightness for takings claims and made clear that Lapidus, in that line of cases, is focused on procedural gamesmanship. The appellants have admitted that there's no bait and switch by the State here. There was no procedural advantage the State tried to gain. The State simply tried to ensure that it was giving a robust defense to its law when it was challenged in federal court. And the Supreme Court's decision last year in Burger v. the North Carolina State Chapter of the NAACP recognizes that States are free to structure themselves for litigation purposes however they want. As a matter of federalism, they have the right to do so. That South Carolina has chosen this particular structure and asked the Attorney General to intervene on behalf of the State rather than necessarily representing the official capacity of defendants. It's a decision that South Carolina is free to make. Just as it's free under the rules and under logic. Judge Harris, did you have a question? I did, but I wanted to let you finish your sentence, but thank you. I don't mean to get you off on a different topic, but when exactly did this case become moot? When did the Act 154, when was the Act, when were all of the Act 154 funds otherwise allocated? Our position is the case was mootest to Act 154 funds when the General Assembly reappropriated that money. That happened in the 2021-2022 budget, which was enacted back the end of June 2021, admittedly before the District Court summary judgment. So you're saying the case was moot when the District Court ruled on it. It didn't become moot on appeal, it was already moot. We believe that's correct. I thought it turned out, I must have misunderstood something, I thought it turned out that that was when they reappropriated $65 million, but that turned out not to be all the money. There was $2.5 million remaining in the State's Coronavirus Relief Fund. In full candor, Judge Harris, I don't know when that $2.5 million was re... I've really just been struggling. I'm trying to figure, because it matters for purposes of our analysis whether this case was moot when the District Court ruled or whether it became moot on appeal. I'm assuming it's moot at all, but if it is, when it happened matters. I think that's right. And what I don't know and what may be hard, at least standing here today I just can't answer, is when that last $2.5 million was reallocated under Section 12 of Act 154 as the General Assembly allowed it to be done. But it was prior, it was as of June 20, 2022, correct? That's what the declaration says. Correct. All of the money was dispersed by June 20, 2022. A week before. That was after the District Court ruled while the case was on appeal, after the briefing was completed. Well, to the extent that I agree the request for injunctive relief was moot, but you agree that, I mean, your argument is their damages claim fails and they didn't properly appeal the dismissal of their damages claim, but that's not moot, right? The damages portion of it's not moot. Your claim there is, well, your claim there is that they forfeited any objection to it, right? But that portion of the case is not moot and has never been moot. Correct, Judge Huygens, and I want to be clear that we have the waiver argument and the merits argument on that. No, I understand, right. But neither of those is a mootness argument. Right. That would not be moot. Anything as to the money exactly being there is going to be moot and our position would have been moot since the money was reappropriated or reallocated. The wonderful thing about damages claims is they can never be moot. Precisely. Precisely. So if that's all that's left and that's not moot, which I appreciate, Judge, your point there, damages claims aren't, it fails for the reasons I've discussed already, which is the waiver and on the merits the state's allowed to intervene here. If the court has further questions on those, I'm happy to address them as well as on the standing about the GEAR funds, although with that being moot, it would seem that the standing issue is no longer necessarily before the court. But just so I understand where we are, you don't know whether the injunctive relief in this case mooted out before the district court ruled or after the district court ruled? Standing here today, no, I do not, Judge Harris. Okay. Bit of a twist. Judge Harris, if the court would like, I am happy to submit a 28-J letter with a declaration from a state official as to when that money was reallocated. It would be helpful to know. I don't think it makes a difference in the end, but if it moots out on appeal, we apply one standard about when we should vacate. If the district court didn't have authority to rule when it ruled, we obviously vacate. And so it's a slightly different analysis. Certainly. We will endeavor to find that out and submit a 28-J letter for the court. If the court has no further questions, I would yield back the balance of my time. All right. Thank you. Thank you, Judge. And so we'll hear from Mr. Heydrich. May it please the court, Thomas Heydrich for the State of South Carolina. Although I do intend to primarily address the merits, I did want to draw two points to the court's attention on the issue of sovereign immunity just for the benefit of the court. First, at JA-13, where you see where Judge Hendricks granted the state a motion to intervene, you'll see that the state adopted the answer of Governor McMaster in this case, which is at JA-50. At JA-50, you'll see that the state and that Governor McMaster did specifically assert sovereign immunity in that answer. So sovereign immunity was asserted throughout the course of the litigation. As I was preparing for oral argument, even though I do intend to mostly address the merits, I also wanted to draw one other case to this court's attention, and that's the Union Electric case. And that's from the Eighth Circuit in 2001. That's a site at 366 F. 3rd, 655. I think that case is important. Did you provide that site to opposing counsel before just now? No, Your Honor. I did not. All right. Then he can have the opportunity to file a 28-J letter on that case in response if you'd like, Mr. Sir. Yes, Your Honor. That makes sense. But I think that that case is important for this court to consider because it deals with a factual situation that's very similar to the situation before that court. And that was the case where there were state defendants named. The attorney general of that state moved to intervene, and the Eighth Circuit concluded that that act of intervention alone did not constitute a waiver of sovereign immunity. So those two points I thought would be helpful on the sovereign immunity issue. But moving to the merits, if this court for any reason decides that this case is not moved, Judge Hendricks' grant of summary judgment should be affirmed because no reasonable jury could conclude that Article 11, Section 4 of the South Carolina Constitution was motivated by a discriminatory purpose of any kind. And when we're considering that, before we get into the legal analysis, I think it's very important to be clear about what Section 4 does and what it does not do. And appellants throughout this litigation I think in good faith have attempted to compare Section 4 to a Blaine Amendment. But as Judge Hendricks recognized, Section 4 is materially different from other no-aid provisions or so-called Blaine Amendments. And that's true for at least two reasons. First, it's true because Section 4 applies to all private educational institutions in our state. And that's true whether they are secular or religious. And what does it bar? Well, it only actually bars direct aid. So the money cannot flow directly to those private institutions. It does not bar indirect aid. So, for example, the state of South Carolina, as a policy decision, may choose to provide scholarship opportunities to students to pick a university of their choice, whether that's public or whether that is private. And the state has in fact done that. If you look at JA 146, you'll see a list of schools that are eligible for institutions of higher education. Those are religious institutions like Bob Jones University and also historically black colleges and universities like Allen and Benedict. So I think it's very important to be clear that Section 4 is facially neutral and that it actually facilitates and fosters in some ways aid to private institutions of all kinds. So turning to the legal analysis, we think Judge Hendricks got the legal analysis exactly right. And I think that's true whether she cited this court's decision in Raymond or whether she simply applied the Arlington Heights Framework. So going through the Arlington Heights Framework, Judge Stacker, I think this is something you pointed out. There simply was no evidence of discriminatory impact in the 1970s in this case or in the present. Frankly, that's something that appellant's own expert, Dr. Graham, conceded. He acknowledged that it applies to people of all races and all religions. There's a JA site for 271 that you can see there. Turning to the second Arlington Heights factor, you can look at the sequence of events leading to the adoption of Section 4. And again, appellants offered no evidence to suggest that Section 4 was adopted in an irregular manner. I think this is a really strong contrast to a case like McCrory where this court was very concerned about North Carolina legislature's actions following the preclearance removal by the Supreme Court. So what happened with Section 4? Well, it was a period of years of deliberative study by our state, starting with the West Committee in 1966, with their final report in 1969, a supermajority of the General Assembly putting the issue on the ballot to South Carolina voters, and then the voters approved it. Let me go back to the disparate impact part just for a minute. Because opposing counsel, I think he was arguing that disparate impact is not necessarily required to be shown under Raymond if you read it correctly in his version of how to read it. What's your response to that? So, Judge Thacker, I think that to the extent there could even be any tension between Raymond and Arlington Heights, this case is really an improper vehicle for teasing out that tension. And that's because Judge Hendricks expressly said even if plaintiffs could get by without showing disparate impact, they still fail under the Arlington Heights factors. And I think that's because they failed to show that there was an irregular sequence of events. They simply offered no legislative history to suggest that the South Carolina General Assembly was racially motivated at the time. And the history, which is primarily the point upon which they rely, is a much more mixed bag than I think appellants have been willing to acknowledge. I think that there's two quick points on that, unless the Court has any other further questions on it. One, the history of this case is significantly complicated by when the origins of South Carolina's no-aid provision actually first came to fruition. The first no-aid provision in South Carolina history actually came forth in 1868, and that was a constitutional convention that was comprised of a majority of African Americans, many of whom were former freed slaves. Those individuals decided that the state of South Carolina should not provide any type of private aid to religious institutions. And second, I think what's further complicated is that appellants really don't offer very much evidence about the West Committee itself. Appellants' own expert conceded that the South Carolina Constitution that adopted Section 4 was effectively a new constitution in our state's history, and he also conceded the fact that the West Committee was looking towards forward progress and towards increased toleration in our state. I think if you look at the composition of that committee, it included people like Dick Riley, who was the governor of South Carolina, and President Clinton, Secretary of Education. In short, we think Judge Hendrick's grant of summary judgment on the merits should be affirmed because this case fails the Arlington Heights test, no matter how it is applied. Unless the panel has any further questions, we'll rest on our briefs. Thank you. All right, Mr. Suri, you have some rebuttal time. I appreciate it, Judge. Thank you. So maybe let me just start with the observation. I think it is hard to say that we waive an argument that has not been crucial to the case until it became relevant. In other words— With respect, I think that happens all the time. We hold defendants to a waiver. You can argue in the alternative. I mean, I just—that's how waiver works. So up until three weeks ago, the plaintiffs were under the impression, along with this court, that the Act 154 funds were there, that they were in the bank. Even as a practical matter, I want to make sure I remember—I'm not sure this matters, but as a practical matter, didn't the defendants argue in their appellate brief, oh, no, the Act 154 thing, that's move two, and in your reply, you didn't say, oh, hang on, then we don't forget about our damages claim. You just said, well, we don't think all the money is gone, but if the money is all gone, then you should vacate the district court's opinion. That's—yes, Your Honor. It is true that in our reply brief, we said, I think, that the State had not shown the money was gone, and they didn't do— But if the money is gone, be sure to vacate the district court's opinion. We did say that, Your Honor, correct. We obviously believe that the Act 154 funds were there, and up until the record gains affidavit, there was nothing in the record showing that they were gone. I also wanted to clarify just on the question about the amended complaint. The amended complaint was because the gear two funds were added, so initially Congress appropriated what we now call gear one funds, and then Congress appropriated a second pot, gear two, but the gear two funds that we added in the amended complaint, at no point did we add claims for or against the State that changed the nature of our litigation. So I think it's a little bit of a retelling of history to suggest that somehow the nature of the litigation or the nature of our challenge to the constitutionality of the State's constitutional provision changed, and that justified the State's decision to intervene. I also think that the answer the State gave on sovereign immunity is less than satisfactory, that his discussion of Georgia Gwinnett, the one answer he was able to suggest for you, Judge Heitens, was that it affected private parties, and obviously that can't be the case, because the entire case was about a constitutional violation. The idea was that the First Amendment had been violated by the college in its application, right? It was a 1983 case, and so to suggest that the mootness analysis is for private parties, I think it's just to miss the point. That's fair, but also I guess I'd say in fairness to your colleague, what do you say to his argument that it's really odd to read that as a case about sovereign immunity when if you do a find function with Gwinnett, I do not find the word sovereign immunity in that entire opinion? Fair enough. I think it's interesting that subsequently the college settled for $250,000, so at least the lawyers for the college felt like they were obligated to pay more than nominal damages. I shouldn't say that. It was like $250,000 in attorney's fees, and they paid the nominal damages. So on remand, the college did not come back and say, well, we have 11th Amendment or sovereign immunity. Yeah, I mean, it's just given how vociferous the Supreme Court has tended to be about protecting sovereign immunity, it seems a little strange to say that they implicitly said someone doesn't have sovereign immunity in a case where there's literally no mention of sovereign immunity. Fair enough, Your Honor. I guess I would say this court as well has never said that nominal damages are barred by sovereign immunity, and the state has been able to— Can I ask you, just sort of given the nature of sovereign immunity, why wouldn't nominal damages be barred? Yeah, I actually think it's a great question, Your Honor. I'm glad you asked it. I think it goes to the policy behind sovereign immunity, right? The taxpayers should not be bankrupted by things that they are not personally responsible for, right? The taxpayers didn't violate somebody's constitutional rights. Appointed officials from elected officials far removed from back tears did. But hasn't the Supreme Court—I agree, that's part of it—but hasn't the Supreme Court said in cases like Alden, it's not just that, it's not just money, it's also the indignity of forcing the state to be a party, of having judges tell, you know, you know— Yes. Yes. I mean, honestly, here are the answers. We didn't force the state to be a party, right? To reduce to our prior conversation, the state chose to become a party. I was asking about your nominal damages argument. Why wouldn't that dignitary rationale apply just as much to $1 as it was to a gazillion dollars? I think it would, Your Honor. I think it would. So the final thing I'll say in my last 25 seconds is the Blaine Amendment, as a label used to describe the 1972, was not our label initially. It was the Attorney General's own label in a 2018 opinion letter that he wrote. And I would say we introduced plenty of legislative history. Both Speaker Solomon Blatt and legislative Senator Marion Gresset were both very aggressive in their segregationist policies. And they were the two men—one served on the West Commission, the other was the sponsor of the West Commission amendments through the legislative process. So I think we more than covered that in the record that we did develop. With that, I see my time is about to expire. Thank you for your attention today. All right. Thank you. And thank all three of the lawyers for your very good and candid arguments today. We appreciate it. And safe travels back.
judges: Stephanie D. Thacker, Pamela A. Harris, Toby J. Heytens